## THE KANSAS PACIFIC RAILWAY COMPANY v. JOSEPH PEAVEY.

1. CASE, *Followed.* The case of *The Kansas Pacific Railway Company v. Peavey,* 29 Kas. 169; 11 Am. & Eng. Rld. Cases, 260; 44 Am. Rep. 630, referred, to and followed.

2. INCOMPETENCY OF COËMPLOYÉ; *Risk, When Assumed.* If an employé knows that another employé is incompetent or habitually negligent, or that the materials with which he works are defective, and he continues his work without objection, and without being induced by his employer to believe that a change will be made, he will be deemed to have assumed the risk of such incompetency, negligence, or defects, and cannot recover for an injury resulting therefrom.

3. CONTRIBUTORY NEGLIGENCE; *Rules, Not Abolished.* The rules of contributory negligence have not been abolished by the act of the legislature making railroad companies liable for an injury to an employé resulting from the negligence of a coëmployé, (Comp. Laws of 1879, ch. 84, ¶ 4914,) nor have such rules in cases like this been abolished by any statute, nor even disturbed.

4. ——— *Habitual Negligence; Instructions, Refused; Error.* Where an employé sues a railroad company for injuries alleged to have resulted from the negligence of a coëmployé, and evidence is introduced on the trial tending to show the habitual negligence of such coëmployé, and that the plaintiff had knowledge thereof, and the defendant attempted, by asking the court to give certain instructions, to submit the question of the coëmployé's incompetency and habitual negligence and the plaintiff's knowledge thereof to the jury, but the court refused, *held,* error.

5. FINDING, *Against Evidence.* And in such a case, where the evidence tended to show that the plaintiff had full knowledge of the habits, skill

and attention of such coëmployé, and a special question was submitted to the jury for them to find thereon, and the jury found that there was no such evidence, *held*, that such finding is against the evidence, and is not true.

6. —————— *Question for Jury.* The question as to whether the plaintiff was guilty of contributory negligence, or not, in this and other respects, was a question of fact, which should have been submitted to the jury.

7. INSTRUCTIONS *May Have Misled Jury.* Where the plaintiff *voluntarily placed himself* in a position of danger, and was injured by the alleged negligence of a *single* coëmployé, and the court instructed the jury that "If he [the plaintiff] did all that a prudent and careful man could or should do in the situation *in which he was placed,* and his calamity was brought upon him by the negligence of other *employés,* he is entitled to recover," *held*, that such instruction is inexact and erroneous; and where the court immediately afterward, and in the same connection, instructed the jury that their verdict should be their conscientious judgment on the facts of the case, "applying the *law as here given,*" *held*, that these two instructions may have misled the jury.

8. SPECIAL QUESTIONS — *Evasive Answers; Error.* Where the plaintiff sued a railroad company for injuries alleged to have been received by him while attempting to couple two cars together, and alleged to have resulted from the negligence of a coëmployé in moving the car to be coupled at too great a velocity, and the evidence tended to show that the plaintiff might have taken a position prior to his attempt to make the coupling, from which position he could have determined with a great degree of accuracy the rate of speed at which the car was moving; but that he did not do so, but took a place from which he could not estimate the rate of speed at which the car was moving with any degree of accuracy, and from which place he attempted to make the coupling, in ignorance of such rate of speed, and was injured; and the railroad company claimed that the plaintiff was guilty of contributory negligence in this respect; and the court submitted the following special questions to the jury for their consideration, and the jury returned the following answers, to wit: "Q. 27. Did not the plaintiff of his own will occupy a position which prevented him from ascertaining the speed of the car which injured him? A. We think he occupied the usual place for making the coupling. Q. 28. Could he not have taken such a position as would have enabled him to determine the speed of the car before he attempted to couple? A. To make the coupling he could not:" *Held*, That these answers are evasive and unsatisfactory, and the court erred in refusing, upon the request of the defendant, to require the jury to answer them properly.

9. —————— *Negligence — Defective Findings.* The evidence and the special findings of the jury commented upon, and *held* to be defective with regard to the negligence alleged by the plaintiff against the plaintiff's coëmployé.

10. SPECIAL QUESTIONS; *Answers, Favorable to Defendant.* Where an employé sues a railroad company for the alleged negligence of his coëmployé, and special questions with reference to facts tending to show the negligence of such coëmployé are submitted to the jury, and the court instructs the jury that if there is no sufficient evidence to warrant a finding upon any of these special questions, that the jury may answer "Don't know," and the jury answer some of the special questions upon this subject in that manner, *held,* that, as the burden of proving the negligence of such coëmployé rests upon the plaintiff, the answers "Don't know" to such questions are favorable to the railroad company, and not to the plaintiff, although the jury may have intended them otherwise.

11. ——— *Instruction; Error.* And *further held,* that the court erred in instructing the jury that they might, under any circumstances, answer special questions of fact by merely saying, "Don't know."

12. ——— *Excessive Verdict.* In an action for an alleged injury, where the injury and loss to the plaintiff were and are merely the loss of a thumb and forefinger of his right hand, the consequent suffering and inconvenience from such loss, a nominal sum of money paid for medicines, and some loss of time while the wound was being cured, *held,* that a verdict for $8,000 is so excessive as to show passion or prejudice on the part of the jury; and even in such a case where the plaintiff remits $1,500 of such verdict, and takes a judgment for $6,500, the amount is still so grossly excessive that the judgment should not be allowed to stand. ( 29 Kas. 170; 11 Am. & Eng. Rld. Cases, 260; 44 Am. Rep. 630.)

*Error from Wyandotte District Court.*

THIS case has once before been in this court, and will be found reported in 29 Kansas, 169, and 11 American & English Railroad Cases, 260, where the pleadings as they then were are set out in full. When the case was formerly here the judgment of the lower court was reversed, and the cause remanded for a new trial. On its return to the court below the defendant, with leave of the court, amended its answer as follows:

"And this defendant, for further answer and by way of amendment, and in lieu of the second paragraph of its answer, says that the plaintiff executed the agreement in said paragraph of the answer mentioned ; that at the time of the execution of the said agreement, John Ellis, in the petition mentioned, was in the service of the defendant, and the plaintiff had served with him and well knew his capacity, habits and man-

ner of handling an engine; that the plaintiff was also a locomotive engineer, and as a locomotive engineer, train dispatcher and brakeman in and about railroad yards, was thoroughly experienced at the time he took service with the defendant, and he ever after that — that is to say, for four years or more — he well knew that it was dangerous, as in fact it was, to engage in the coupling of cars moving detached from the engine without strictly observing the speed of the detached car; and he also believed that he, said John Ellis, was liable to fail to observe signals and to so handle the locomotive as to send the car back faster than it was safe for the brakeman to undertake to couple it; and before the injury complained of said plaintiff had represented to his superior officer, having power to employ and discharge defendant's servants in the yard, that Ellis was liable to send cars back too fast; and yet, well knowing the habits and capacity of the said Ellis, he took service with him and continued in such service for a long time after he had so complained — that is to say, for six months or more — well knowing that he was under obligation by his agreement to quit the service of the company if he had reason to suspect that his co-servants were incompetent or careless, which he was at liberty at any time to do. There was no promise made to him to discharge Ellis, or take any measures to correct or change the manner of service in the yards, of which plaintiff complained; and the said plaintiff, knowing all the facts, and his liability to injury, (the said Ellis at the time of the injury being under his control and direction, and subject to his signals,) ordered by signals a car to be detached from the engine which Ellis was operating, and sent or kicked back unattended — he intending to couple said detached car to a standing car when they should come together. And although the plaintiff believed that Ellis was likely to disregard or fail to observe his signals, and send said car back too fast, yet, without observing or knowing whether this signal was understood by Ellis, and without noticing the speed of the car, or how far distant it was cut off, or paying any attention whatever to said Ellis, the locomotive, or the car, as it was his duty to do, he did carelessly and heedlessly place himself in position to make coupling of the cars, without first taking proper care to know whether it could be safely done; and while attempting to do so, was by his own carelessness, heedlessness and negligence injured in the manner complained of."

August 25, 1884, the plaintiff *Peavey* recovered a judgment

for $6,500 and costs against the defendant *Railway Company*. It brings this judgment here for review. The material facts are stated in the opinion.

*J. P. Usher*, for plaintiff in error.

*Thomas P. Fenlon*, and *John B. Scroggs*, for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: This was an action brought in the district court of Wyandotte county by Joseph Peavey against the Kansas Pacific Railway Company, to recover damages for an alleged injury to the plaintiff, claimed to have been caused by the negligence of John Ellis, a switch engineer in the employment of the defendant. It appears from the record that on August 23, 1879, V. S. Lucas was the yard-master at the defendant's car repair yards at Armstrong, Kansas; that the plaintiff and Abram Myers were yardmen, brakemen and switchmen at that place; that John Ellis was a switch engineer at the same place, and that Almon Noble was the fireman on Ellis's engine, and all were in the employment of the defendant railway company. On that day Ellis, with his engine, was moving a flat car toward another car in that yard, and when within about 200 feet thereof Myers uncoupled the flat car from the engine, and Ellis stopped his engine, and the flat car of its own *momentum* moved forward toward the other car, and when near thereto the plaintiff attempted to couple the two cars together; but in doing so he had the thumb and forefinger of his right hand so crushed that he lost them both. The alleged negligence on the part of Ellis, the engineer, was in his giving the flat car too strong a push, or "kick," thereby propelling it forward at too great a velocity. The case was tried before the court and a jury, and for the foregoing negligence and injury the jury rendered a verdict in favor of the plaintiff and against the defendant for the sum of $8,000. The plaintiff remitted $1,500 thereof, and the court below rendered judgment in favor of the plaintiff and

against the defendant for the sum of $6,500 and costs; and to reverse this judgment the defendant now brings the case to this court.

Some of the questions involved in this case have already been decided by this court. (*K. P. Rly. Co. v. Peavey*, 29 Kas. 169; same case, 11 Am. & Eng. Rld. Cases, 260; same case, 44 Am. Rep. 630.) But other questions are now raised. A vast number of objections are now urged against particular rulings of the court below, in admitting and excluding testimony; in refusing to strike out certain portions of the testimony; in giving and refusing instructions; in refusing to require the jury to answer certain special questions of fact; in refusing to strike out certain answers of the jury to certain special questions of fact; in overruling the defendant's motion for a new trial; in refusing to render judgment in favor of the defendant on the special findings, etc.

It is claimed by the plaintiff in error, defendant below, that by virtue of the contract entered into between the plaintiff below and the defendant below on August 11, 1875, a copy of which contract is set out in full in 29 Kas. 173, and in 11 Am. & Eng. Rld. Cases, 262, 263, the plaintiff cannot recover; that the alleged negligence of Ellis was at most only the negligence of a fellow-servant, a coëmployé, and not the negligence of the railroad company itself, and that with regard to such negligence the contract is valid and precludes a recovery. A majority of this court, however, when the case was formerly here, decided against this claim of the defendant below. While the writer of this opinion concurred in the most of that decision, yet he did not concur in this particular portion thereof, and he still thinks it erroneous. The correctness of that decision is now challenged by counsel for defendant below. He claims that it is against authority and erroneous upon general principles, and cites in support of his claim the case of *Griffiths v. The Earl of Dudley*, 9 L. R., Q. B. Div. 357, and the note to the case of the *K. P. Rly. Co. v. Peavey*, 11 Am. & Eng. Rld. Cases, 276. (See also note to Peavey's Case, in 44 Am. Rep. 633.)

It is also claimed by counsel for defendant below, that even if the aforesaid contract be held to be against public policy and void, so far as it permits a waiver or release of damages resulting from negligence, still that the following provisions which are contained in the contract must be held to be valid, at least so far as they apply to the acts of mere fellow-servants in the same common employment, to wit:

"And I agree that before exposing myself to danger in coupling or uncoupling, handling, using or moving any engine or car, I will examine the condition and sufficiency thereof, and if found in any respect defective or insufficient, that I will report the same forthwith to the person under whose immediate supervision I am employed. And I hereby further agree to rely, at all times, upon my own judgment as to the condition and sufficiency of all the articles, machinery, implements and tools herein enumerated, and used by said company, and also as to the *competency and skillfulness of its servants* in all grades and departments, and that I will quit the employment of said company whenever I am unwilling to abide by the terms of this agreement."

It is claimed that freedom to contract should be the universal rule, unless the contract is clearly and manifestly illegal, immoral, or against public policy; and it is further claimed that no contract should be construed to be against the spirit or policy of a statute unless the statute itself in express terms or by the clearest of implications shows that the contract is in contravention of its spirit and policy; and it is further claimed that this rule of construction is particularly applicable where the statute itself is of recent origin and in derogation of the principles of the common law which have existed for centuries and been established from time immemorial. There is no claim that the present contract is illegal, immoral, or against public policy, unless it is against the spirit or policy of chapter 93 of the Laws of 1874, (Comp. Laws of 1879, ch. 84, ¶ 4914,) which goes to the extent of making railroad companies liable for injuries to a servant or employé, resulting from the negligence of a fellow-servant or coëmployé while in the same common employment. While the writer of this opinion is still of

the opinion that the decision made by this court, holding that the contract between the plaintiff and the defendant was against public policy and void, is erroneous, still he has no disposition now to weaken the force or effect of that decision.   That decision makes the law to be in Kansas precisely what an express provision of the statute makes the law to be in Iowa; and therefore the law as thus made cannot be very bad; indeed, the writer of this opinion is inclined to think that it would be better if the legislature should go further, and prohibit the present mode of coupling cars with links and pins, and should require that automatic or self-coupling appliances should be used in all cases, and should enact that railroad companies should in all cases be absolutely liable for injuries resulting from the use of links and pins in coupling cars.   The amount of injury suffered from this source is frightful.   The longest and most varied experience cannot exempt the car-coupler in every case from injury.   But so long as the law remains as it is, the courts have no discretion but to enforce it.

1. Case, followed.
Following the decision heretofore made in this case, we cannot see that it is necessary to make any further comment with reference to said contract.

One of the rules of the common law which we think is still in force, is as follows: If an employé knows that another employé is incompetent, or habitually negligent, or that the materials with which he works are defective, and he continues his work without objection, and without being induced by his employer to believe that a change will be made, he will be deemed to have assumed the risk of such incompetency, negligence, or defects, and cannot recover for an injury resulting therefrom. (*Kroy v. C. R. I. & P. Rld. Co.*, 32 Iowa, 357; *Laning v. N. Y. C. Rld. Co.*, 49 N. Y. 521; same case, 2 Thompson on Negligence, 932; *McQueen v. C. B. U. P. Rld. Co.*, 30 Kas. 689; *Jackson v. K. C. L. & S. K. Rld. Co.*, 31 id. 761; 2 Thompson on Negligence, 1008 to 1018, §§ 15 to 23, and cases there cited.)   Now, holding, as we still do, that the aforesaid contract is void to the extent that it has already been held to be

2. Incompetency of co-employe; risk, when assumed.

void by this court, we think that the defendant cannot claim anything more favorable to itself under the contract than may rightfully be claimed under the foregoing rule of the common law. It is admitted, so far as this case is concerned, that

**3. Contributory negligence; rules, not abolished.** the rules of contributory negligence have not been abolished by the foregoing statute, or by any statute, nor even disturbed. There was evidence introduced on the trial tending to show that Ellis "was passionate, and was in the habit of sending cars back too hard, and would not obey signals," and that the plaintiff had full knowledge of all these things as early as the summer of 1878; and the defendant attempted, by asking the court to give certain instructions, to submit the question of Ellis's

**4. Habitual negligence; refusal of instructions; error.** incompetency and habitual negligence and the plaintiff's knowledge thereof to the jury, but the court refused, and the defendant excepted. In this we think the court committed error. Peavey knew Ellis's competency, capacity, and habits; and he well knew them, for he himself had ample capacity and opportunity to judge. They had been coëmployés together in the same yard for a long time. Also, Peavey himself had great experience as a railroad man. In all probability he was the most competent of all the railroad men who had any connection with the injury. He had been in railroad employment for about twenty years, and had been fireman, engineer, brakeman, conductor, train dispatcher, etc. He was next in authority to Lucas, the yardmaster, but had had a much longer and more varied experience than even Lucas. But, notwithstanding all the foregoing facts, the jury found specially as follows:

"*Ques. 32:* Did not the plaintiff well know the habits, skill and attention of John Ellis to his duties?

"*Ans.:* There is no evidence to show that he did."

**5. Finding, untrue.** This finding is not what it should have been. Indeed, it is against the evidence, and not true.

The defendant also claims that the plaintiff was guilty of contributory negligence in other respects. It claims that if the car was moving at too great a speed for safe coupling, the

plaintiff should have known it, and should not have attempted
to make the coupling; that he was competent, and master of
the situation; that if he could not have known the speed of
the car from the place where he was required to stand to make
the coupling, he should have removed from that place, laterally,
a sufficient distance from the track to have enabled him to
determine such speed. It was in evidence that if the plaintiff
had stood ten feet or more from the track, or at as great a
distance from the track as the approaching car was from the
place where the coupling was to be made, he could have esti-
mated the rate of speed at which the car was moving with
considerable accuracy; and of course if the car was moving at
a velocity too great for safe coupling, it was Peavey's duty not
to attempt to make the coupling; and if he did make such at-
tempt under such circumstances, he was guilty of such con-
tributory negligence as would preclude his recovery. There
was some opinion evidence introduced by the plaintiff, over
the objections of the defendant, tending to show that the plain-
tiff could not determine the rate of speed of the approaching
car from the place where he was required to stand to make the
coupling. Of course he could not have determined such rate
of speed from that place with the same degree of accuracy as
he could from a place a few feet or many feet from the rail-
road track; but that would not excuse his negligence, if in
fact he was negligent and careless in taking a position where
he could not make any proper estimate of the rate of speed
at which the car was moving without first having resorted to
all the reasonable and available means for ascertaining such
rate of speed. As to what the evidence with respect to these
matters proved, and whether it showed that the
plaintiff was guilty of contributory negligence or
not in this respect, were properly questions of fact to be sub-
mitted to the jury, and we think they were fairly submitted
to the jury, except for some slight want of precision and ac-
curacy in some of the instructions. For instance, the court
instructed the jury, among other things, as follows: "If he
[Peavey] did all that a prudent and careful man could or

6. Question
for jury.

31 — 34 KAS.

7. Misleading instructions. should do in the situation *in which he was placed*, and his calamity was brought upon him by the negligence of the other *employés*, he is entitled to recover." Now Peavey *voluntarily placed* himself in the situation where he was injured, and was not *placed* there by others, or by the order of others, and there is no claim by the plaintiff that his calamity was brought upon him by the negligence of any other employé than Ellis. This instruction is inexact and erroneous. And immediately after the giving of this instruction, and in connection therewith, the jury were further instructed by the court that their verdict should be their conscientious judgment on the facts of the case, "applying *the law as here given* for your [their] observance." These two instructions together may have misled the jury, and in all probability the jury for some reason did not fairly consider the question of Peavey's negligence in placing himself in said situation of danger. Special questions upon this subject were submitted to the jury for their consideration. Two of such questions, with their answers, are as follows:

"Q. 27. Did not the plaintiff of his own will occupy a position which prevented him from ascertaining the speed of the car which injured him? A. We think he occupied the usual place for making the coupling.

"Q. 28. Could he not have taken such a position as would have enabled him to determine the speed of the car before he attempted to couple? A. To make the coupling he could not."

These answers were evasive and unsatisfactory. No one questioned or doubted the fact that the plaintiff, when he attempted to make the coupling, "occupied the usual place for making the coupling," and that "to make the coupling he could not" have been at a point sufficiently distant from the track to have estimated accurately the rate of speed at which the car was moving; but the mooted question was not one of these, but was whether he could not have taken a position a short distance from the track, prior to his attempting to make the coupling, from which position he could have ascertained with a great degree of accu-

8. Special questions; evasive answers; error.

racy the speed of the car, and have thereby known whether it was prudent or safe for him to attempt to make the coupling, or not.   If it was prudent, he could have then made the coupling; if not prudent, he should not have attempted to do so.   He was master of the situation.   The car was about two hundred feet distant when it was first detached from the engine, and it would seem that he had plenty of time for all this.   Upon the return of these questions and answers to the court, the defendant asked the court to require the jury to answer the questions properly, but the court refused, and in this we think the court committed error.   From the evidence, the instructions, and the findings of the jury, as made, we think we should assume that the plaintiff exercised proper care and diligence at the place where he attempted to make the coupling; but the question whether he exercised proper care and diligence in taking that place before ascertaining the speed of the approaching car, is still an open, unascertained and undecided question, and the court erred in refusing to require the jury to decide it.   It was certainly material.

The only negligence charged against Ellis is, that he applied too much power in moving the car.    Now there was no evidence tending to show that Ellis had any knowledge that the car was to be detached from the engine until the time when the signal was given for such detachment; there was no evidence tending to show that Ellis had any knowledge as to the purpose for which the car was to be detached, or as to the distance which it was expected or intended the car should go; and there was no evidence tending to show that Ellis was moving the engine and car more rapidly than he was permitted to do in that yard, or more rapidly than safety would ordinarily permit; and no evidence that he moved the car any faster after it was detached than before.    Indeed, the evidence tends to show the reverse. It tends to show that as soon as the car was detached from the engine the car and engine separated, the car moving faster than the engine, and the engine stopping within ten or fifteen feet.    Could Ellis be negligent under such circumstances?

*Comments on the evidence and findings.*

But before answering this question many other matters must be taken into consideration. It would seem that in order that Ellis should be considered as negligent he should have known that the car was to be detached, and when and where it was to be detached, and for what purpose it was to be detached, and the distance it was expected that the car would move after being detached; also, the nature of the track, its smoothness or roughness and the grade, and the condition of the car, whether it moved easily or not, and whether it had recently been oiled or not; and, knowing all these things, he should then have been capable of estimating the amount of steam necessary to be applied to the engine in order to drive the car to the point of its destination at a speed ranging only from two to three miles an hour. Now with Ellis's want of knowledge as to whether the car was to be detached at all or not, as to when or where it was to be detached, for what purpose it was to be detached, the distance it was to go, etc., was he bound to make such close calculations with regard to the power to be applied to his engine as to give the car a particular rate of speed when it should be detached, when the plaintiff, who knew that the car was to be detached, when and where it was to be detached, for what purpose it was to be detached, and where it was to go, is virtually relieved by the decision of the court below from the necessity of having any knowledge of the speed with which the car was actually moving after it was detached? It might have been profitable for the jury to have compared the negligence of Ellis with that of the plaintiff, but the court, at the request of the *defendant*, instructed the jury that they must not do so. This instruction would indicate that the defendant, or rather the defendant's counsel, believed that the negligence of Ellis was greater than that of Peavy; and possibly it was. But still the question remains: How could Ellis calculate the amount of steam that should be applied to send any car, on any track, for an unknown distance, at a particular rate of speed, when the plaintiff could not estimate the rate of speed at which this particular car was *actually* moving? In this particular case the grade was descending, the track

smooth, and the car was an ordinary flat-car; and all these things the plaintiff and Ellis and the others were required to know; but whether the car would move easily or not, whether it had recently been oiled or not, whether it was to be detached or not, and if so, for what purpose it was to be detached, and when and where, and the distance it was expected to go after being detached, Ellis was, so far as the record shows, entirely ignorant, while of some of these things at least, and possibly all, the plaintiff had full knowledge. Of course all could see the standing car about two hundred feet distant from where the other car was detached, but Ellis did not know that the moving car was to go only to the standing car, or that the two were to be coupled together.

There seems to be a defect in the evidence, and also in some of the findings, as to the supposed negligence of Ellis; and yet

9. Negligence; defective evidence and findings.

it devolved upon the plaintiff to prove such negligence. We have already made sufficient statements with regard to the defects in the evidence; and as tending to show some of the defects in the findings upon this subject, we would give the following special findings of the jury, to wit:

"Q. 33½. Were not the car and locomotive in motion going toward Peavey, when he gave the signal to Myers to cut the car off? Ans. We don't know.

"Q. 34. Did Ellis know that the car was to be cut off and run alone toward Peavey until Peavey gave the signal to cut off, and if he did, say how he was informed of it and by whom? A. We don't know.

"Q. 29. What rate of speed was the engine moving at the time the car was cut off from it? A. We don't know.

"Q. 22. Did Ellis know that plaintiff was ignorant of the speed of the car? A. We don't know.

"Q. 16. Was the movement of the locomotive arrested, as soon as it was usual or practicable to do it, after he received the signal? A. We don't know."

As before stated, there was no evidence introduced tending to show that any additional impetus or motion was given to the car by the engine after the car was detached from the

**10. Answers, in favor of defendant.** engine. Indeed, the evidence tends to show the reverse. Under the instructions of the court the answers to these questions are in favor of the defendant, although it is possible the jury intended them the other way.

The court instructed the jury with regard to the special findings, as follows:

"The jury will answer the questions in the affirmative upon a preponderance of the evidence bearing on that point. If they find the testimony evenly balanced, or not supported by a preponderance of the evidence, they will answer in the negative; and if not sufficient evidence in favor or against any question to warrant an intelligent answer, they will say 'Don't know.'"

By virtue of the foregoing instruction and answers, it must be assumed that the engine and car were in motion, going toward the plaintiff, when he gave the signal for the car to be detached; that Ellis did not know, prior to that time, that the car was to be detached; that the engine and car, prior to that time, were not moving at a dangerous rate of speed; that Ellis did not know that the plaintiff was ignorant of the rate of speed at which the car and engine were moving; and that the engine was stopped in its movement as soon as it was practicable to stop it after the detachment; for the jury in effect found that there was no evidence to the contrary, and the burden of introducing such evidence, if any could be obtained, rested upon the plaintiff, and not upon the defendant; that is, the burden of showing that Ellis was negligent rested upon the plaintiff, and not upon the defendant.

**11. Erroneous instruction.** The foregoing instruction, however, was itself erroneous. The trial court should not have given it; for where such an instruction is given the jury will generally answer many of the questions by simply saying "Don't know," when in fact they might and ought to give, under the evidence, intelligent answers to the questions. In the present case, out of thirty-six special questions presented to the jury, they answered nine of them by simply saying "Don't know."

They also answered parts of two others in the same manner; and also answered two others in substantially the same manner —virtually answering thirteen questions by simply saying that they did not know, or that there was no evidence upon the subject. Of course it is proper in some instances, where the jury have made an honest effort to answer the questions properly and have honestly failed, for the court to relieve them from giving proper answers and to permit them to give answers by merely saying they "don't know." But the court should not permit the jury to make such answers until the court is satisfied that the jury have faithfully endeavored to answer the questions properly and failed to do so, and until after the court is satisfied that the jury cannot answer the questions in any other manner.

We now come to the last point made in the case; and that is, that the verdict is so excessive as to show passion or prejudice on the part of the jury. This point is un-

12. Excessive verdict.

doubtedly well taken. The injury and loss to the plaintiff are merely the loss of a thumb and forefinger, the consequent suffering and inconvenience from such loss, a nominal sum of money paid for medicines, and some loss of time while the wound was being cured. It does not appear that the plaintiff paid anything for surgical or medical attendance, or for nursing, and he cannot tell what he paid for medicines, whether one dollar or five, or some other small sum. The defendant's surgeon attended him at the defendant's expense. Now a verdict for $8,000 for such an injury certainly shows passion or prejudice. The plaintiff, however, remitted $1,500 thereof, and took a judgment for $6,500 ; but even this amount is grossly excessive, and a judgment for such an amount for such an injury should not be allowed to stand. (29 Kas. 170; 11 Am. & Eng. Rld. Cases, 260; 44 Am. Rep. 630.) If the contest had been between two persons in ordinary circumstances, the jury in all probability would not have allowed $1,000, possibly not $500, even if they had allowed anything.

There are some other questions presented in this case, and the court committed a few other errors, but as we have already

discussed the principal questions involved and the principal errors committed, we do not deem it necessary to add anything further to this opinion, except that we might say that some of the errors committed are so trivial that they would not require or even authorize a reversal of the judgment below. Indeed, some of the errors which we have commented on probably come within this category of trivial errors; but, taking all the errors together, including the excessive judgment, and they present such a strong case of error that no proper course is left but to reverse the judgment.

The judgment of the court below will be reversed, and the cause remanded for a new trial.

All the Justices concurring.